Argued January 18, affirmed March 22, 1961

## DALY *v.* JACKSON ET AL
360 P. 2d 542

*Sam Kyle*, Albany, argued the cause for appellants. On the briefs were Willis, Kyle & Emmons, Albany.

*Melvin Goode*, Albany, argued the cause for respondent. With him on the brief was Willard Bodtker, Albany.

Before McALLISTER, Chief Justice, and WARNER, SLOAN, O'CONNELL and LUSK, Justices.

WARNER, J.

The plaintiff, Daly, brings this suit for specific performance against the defendants, Hub City Concrete Company, a corporation, and Thomas Jackson and Bryan Jackson, as the principal stockholders of the corporation, wherein he prays for a decree requiring said stockholders to cause the corporation to issue to plaintiff its note for $25,000, pursuant to an alleged agreement between plaintiff and the corporation, and for a judgment against the corporation in the sum of $4,000 for a loan made by plaintiff to the corporation. Defendants admitted liability on the second count but appeal from the decree which directed issuance of the $25,000 note.

In the spring of 1958, and prior thereto, O. L. Bowman and wife were the owners and operators of a very successful sand and gravel business, located in Albany, Oregon, known as Bowman's Sand and Gravel. The business consisted of a plant site on the Willamette River and the machinery and equipment used in operating it. Sometime prior to February, 1958, the Bowmans decided to sell.

Inasmuch as Daly's dealings were in the main solely with defendant Thomas Jackson and defendant Bryan Jackson, his brother, did not become a stockholder until after the Bowman purchase was made and the corporation organized, when we hereinafter refer to "Jackson," such reference will be to Thomas Jackson.

There is no dispute that the Bowmans had offered to sell the business at a price and gave Daly the first opportunity to purchase the same. It is also true that this had not been formalized as a binding agreement. From Mr. Bowman's deposition we learn he felt honor bound to consult with Mr. Daly and give him the first opportunity after a certain length of time to purchase before selling to any other person. Daly's option to buy was in essence a gentlemen's agreement.

The Bowmans and Daly were not strangers. They had known each other for more than 10 years. During that time Daly, as a local contractor and builder, had had extended business relations with them. The Bowmans had been suppliers of his concrete and gravel. It also appears that over the years Daly had built some houses on lots platted and sold by Mr. Bowman. It would seem that their associations had inspired a closeness between them coupled with a high degree of mutual faith and confidence.

Sometime in February, 1958, Daly informed Jackson of his opportunity to acquire the Bowman business. Jackson was a neighbor he had known for more than seven years and expressed an earnest desire to go into the Bowman deal with Daly as a partner. At that time Daly had pending negotiations with a man named Larson and could not treat with Jackson. But when the negotiations with Larson came to naught in the latter part of March or the first of April, Daly offered his opportunity to Jackson. Then, as there-

after, their prospective association was always discussed in terms of a partnership. Some delay was experienced until Jackson could arrange with his father, who lived in Canada, to secure the necessary money required of Jackson for his share.

The Bowmans had indicated to Daly that they would be willing to sell the sand, gravel, redi-mix and concrete portion of their business, including their sand and gravel plant, their redi-mix batching plant, and all their rolling stock and equipment, consisting of two dump trucks and three mixer trucks, a Scoopmobile and 38 B shovel, for $122,500. The real property upon which the foregoing plants were situated was reserved for a lease to the Dalys (plaintiff and his wife). This consisted of approximately 30 acres with a frontage of about one-half mile along the banks of the Willamette River from whence they took their sand and gravel under an arrangement with the state of Oregon.

The record is clear that the negotiations between Daly and Jackson resulted in an agreement that each was to have an undivided interest, as partners, in the enterprise when the deal was consummated with the Bowmans; that Jackson would furnish $25,000 to be used as the down payment on the contract for the Bowman equipment purchased for $122,500; and that Daly's share in the partnership would be represented by his contribution of the opportunity and privilege of buying the Bowmans' business, together with the lease to the real property upon which the Bowman equipment was situated. These items were to represent payment of Daly's share in the partnership assets, mutually valued at $25,000. When the parties later decided to incorporate, it was further agreed that instead of taking stock in the amount of their

respective contributions they would each take the corporation's note for $25,000.

That such was the agreement of Jackson and Daly is confirmed by the testimony of Jackson, who stated he entertained the belief that Daly was also entitled to receive a $25,000 note at the same time Jackson received his. Jackson's note is dated May 28, 1958. He stated that he continued thinking so until sometime in August, a period when the parties had begun to row among themselves. It was then that Jackson discovered, so he says, that Daly had made the so-called "secret profit," to which we will make later reference.

After the completion of the incorporation on or about April 29, 1958, the Hub City Concrete Company entered into a contract of purchase with the Bowmans to purchase their plant and equipment for $122,500. Jackson's capital contribution of $25,000 was used for the required down payment. Coincidental with the execution of the contract the Bowmans executed their lease to the land in favor of Daly and his wife, as lessees, who on the same date made a sublease to the corporation.

For their first assignment of error appellants assert that the decree must be set aside because of a failure of proof in the following respects. First, because of the absence of evidence that Mrs. Bowman had any agreement with Daly concerning the sale of the Bowmans' Sand and Gravel Company, and, secondly, because there was "No formal or binding agreement * * * between [Daly and the Bowmans]."

The record does not disclose Mrs. Bowman's precise legal relationship to the business sold. As near as we can glean she was a partner with her husband.

It is true that as between Bowman and his wife,

as the owners of the gravel business, and Daly, there existed no option in form which Daly could enforce. Notwithstanding this, he had a right to rely upon the Bowmans' promise to give him a preferred or first opportunity to buy. If Daly did not misrepresent this relationship to the Jacksons, we do not see where defendants can complain. There is no evidence that Daly did so. Nor is there evidence that defendants' situation would have been improved by a formal binding option between Daly and the Bowmans. Neither Jackson nor the corporation was buying the option from Daly. The Bowmans fulfilled their moral promise to Daly and the corporation was the beneficiary.

Although it would appear most of Daly's conversations were with Mr. Bowman, the documents of record (the contract of sale to the corporation and lease to the Dalys) are signed by Mrs. Bowman, thereby indicating she ratified without qualification her husband's representations to plaintiff. We find no failure of proof and hence no merit in defendants' first assignment.

■ For defendants' second assignment they complain that the trial court erred in failing to sustain their theory of fraud on the part of Daly.

In order to circumvent plaintiff's allegations and proof with reference to the agreement made by and between Daly and Jackson, and particularly that part relating to the giving of the $25,000 note by the corporation to each of them, defendants attempt to cast upon Daly the character of a "promoter" with all of the incidents of high fidelity peculiar to that role. With this as their premise they impute to plaintiff fraudulent dealing in the nature of obtaining a secret profit.

They claim that Daly had informed defendants,

particularly Jackson, that he had transferred to the Bowmans land or equities of the value of $25,000 as consideration for the lease which he later subleased to the corporation. They say this representation was false and that Daly furnished, as consideration for the lease, property of very little value and, therefore, the note which plaintiff demands would be in the nature of a secret profit. However, no claim is made that the Jacksons or the corporation by the aforesaid acquisition of the Bowman properties sustained any loss or damage or that the lease transferred by the Dalys represented less than the price which the corporation paid for it. Nor is it seriously disputed that Daly transferred to the Bowmans some land or equities in land owned by him as consideration for the lease which they gave him. Defendants content themselves by saying that the land and equities given to the Bowmans were of very small value and not $25,000 which they assert Daly represented to them. The true value was never disclosed, nor did defendants supply any evidence in support of this contention.

To the contrary, Daly denies having ever told defendants what he gave to the Bowmans was worth $25,000 or any considerable part of that amount and that Jackson was always so informed. In this Daly is supported by the testimony of Mr. Warner, the accountant with whom both parties consulted when formulating the corporation. That the lease had a value of $25,000 to the corporation there can be but little doubt. As we earlier noted, it covered the 30 acres of land lying in a strip along the river from whence the Bowmans removed their sand and gravel and supported all the structures and equipment used in that operation.

The word "promoter" is a familiar one, but when

used in legal parlance it is usually related to promotions which are preliminary to and have in prospect the organization of corporations. In that context it means a self-constituted organizer who finds an enterprise or venture and helps to attract investors, form a corporation and launch it in business, all with a view to earning promotion profits. 1 Thompson, Corporations (3d ed), 106, § 96; Lattin, Corporations, 97, § 2; Ballantine, Corporations, 824, § 356; 1 Fletcher, Cyclopedia of Corporations, 593, § 189; Ehrich, Promoters, 4, § 3; 1 Oleck, Modern Corporation Law, 174, § 33; 2 Cook, Stock and Stockholders (3d ed), 910, § 651; 18 CJS 521, Corporations § 119.

All of the foregoing texts reiterate that the formation of a corporation has its inception from the beginning of the promoter's promotional efforts and is the ultimate aim of his endeavors.

■■ There is no magic in the word and whether a person is or is not a promoter is a question of fact and not of law, and must be determined with due regard to the circumstances in each case. 18 CJS, supra, at 521. Proof that one is engaged in the activities of a promoter rests upon the party affirming it. Ehrich, supra, at 26.

Defendants' defense built around Daly as a promoter has no merit. It overlooks that the incorporation of the Bowman business was never a part of Daly's plan when he began his quest for a partner. The formation of a corporation was not in his mind when he opened negotiations with Jackson, nor was it within the contemplation of Jackson. Both for a considerable period talked solely in terms of partnership and planned their respective roles as equal partners in the venture.

Daly stated he knew nothing about corporations

and never had such an entity in mind, nor did Jackson. Mr. Boock, the attorney to whom they had gone, apparently to formulate their deal sometime in early April, says the proposal to incorporate originated with him. On April 29, 1958, the corporate defendant was organized. It was first planned that Daly and Jackson would take an equal number of shares for their respective contributions to the capital account. This was later changed to an agreement to take the corporation's notes for $25,000 each and shares for an additional $1,000 they had also contributed for working capital. This shift from equal shares to equal notes for $25,000 apparently was made for reasons of tax expediency and on the advice of Mr. Warner, the accountant.

To call Daly a "promoter" under the circumstances is to torture the true legal significance of the word if, as the foregoing definition signifies and the texts cited support, a promoter is a person who from the beginning of his preliminary negotiations looks to the formation of a corporation as a vehicle for the consummation of his enterprise.

Aside from the circumstances which in this case take Daly out of the promoter category, we are content that he was guilty of no species of fraud in dealing with Jackson or the corporation whether we call it a secret profit or otherwise. It appears to us that the charge of fraud made by defendants was a late afterthought born of Daly's difficulty in getting on well with defendant Bryan Jackson as an employee of the company.

The decree is affirmed.

LUSK, J., concurs in the result.